

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

No. 06-14-00204-CR

CLIFFORD BERNARD NELSON, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the County Court at Law No. 1
Gregg County, Texas
Trial Court No. 2013-1871

Before Morriss, C.J., Moseley and Burgess, JJ.
Memorandum Opinion by Justice Moseley

## MEMORANDUM OPINION

After a bench trial, Clifford Bernard Nelson was found guilty of misdemeanor assault causing bodily injury—family violence,[1] sentenced to 350 days in county jail, and fined $500.00. In this appeal, Nelson asserts that the trial court erred in admitting the recorded statements made by Erica Minifield, his victim. He also asserts that there is insufficient evidence to support his conviction. Finding no error, we affirm the judgment of the trial court.

## I.    Background

Officers Trevor Yates and Audrey Teter of the Longview Police Department responded to an April 28, 2013, dispatch call to a residence on 14th Street in Longview, Texas, this call being the report of an assault. On arrival at the house, the officers located Minifield lying on a bed in a back bedroom. Yates testified that Minifield was lying in a fetal position with cuts on her legs and arms, blood in her hair and coming out of lacerations on her face, and that she complained of being in pain. Yates particularly remembered a gouge-type injury on her head. Minifield was transported to Longview Regional Medical Center (LRMC) where Yates and Teter made an audio/video recording of her statement regarding the assault.

Responding to the officers' questions in the video recording, Minifield told them that "Clifford" (Nelson), who, evidence showed, was the father of her adult sons, was the person who had beat her. According to Minifield, she had been with friends down the street from her house when Nelson drove up in his truck, got out, and began talking "noise," this verbal attack progressing to the commencement of his beating her on her head, legs, and body with his fist and

---

[1]*See* TEX. PENAL CODE ANN. § 22.01(a)(1), (b)(2) (West Supp. 2014).

with a stick the thickness of her hand. She described the stick used in the beating as being like a cut tree limb with jagged edges. She stated that she lost consciousness several times. She explained that although she and Nelson lived together, he has always been jealous of her and thought she was seeing someone else. The audio/video recording reveals that she had a gash in her scalp with fresh blood, multiple lacerations on her chin, face, elbow, and legs, and contusions on her elbow and legs. She maintained that this was the first beating she had endured by Nelson, and she said, "I can't believe he would do this to me."

Dr. Harold Taylor, a physician in the emergency room at LRMC, treated Minifield that evening and two times following that evening. Taylor testified that when Minifield was brought to the emergency room that night, her injuries included a four-centimeter laceration to the frontal scalp together with multiple contusions and lacerations to the left side of her face, right arm, right elbow, and right leg, all of which were consistent with being struck with a blunt object. Taylor stated that Minifield told him at the emergency room that Nelson had struck her with a stick.[2] After Taylor's examination of Minifield, her wounds were cleansed and dressed, and the scalp laceration was stapled.

At trial, Minifield testified that Nelson is the father of her two sons, aged eighteen and nineteen, and that she and Nelson were still together. Initially, she denied that anything untoward had happened April 28, 2013. She then testified that she had gone to MLK (Martin Luther King) Park in Longview with Rhonda Lilly and Chad Daniels that day and that she had gone to the

---

[2]Although Nelson objected to this testimony as hearsay at trial, no error in the admission of this testimony is asserted on appeal.

hospital that night. After being shown photographs of the injuries she suffered that night, although Minifield acknowledged that she had been hit in the head with a stick, necessitating her receiving staples in her head, she stated that the incident happened at night and that she had gone to the hospital afterward, but she did not know who had assaulted her. While Minifield acknowledged that she knew Frank Daniels (Chad Daniels' father) and Lilly and Melissa Reedy, she said that she did not recall having told any of them or the police officers the identity of her assailant. After being shown the recording of the statement she gave to the police officers, she recalled having said the things documented on that recording, but she still denied having a present recollection of who assaulted her. She also admitted having talked with Lilly the day after the assault, but did not remember telling Lilly who assaulted her. Minifield testified that the injuries she received caused her pain.

On cross-examination, Minifield denied that Nelson had assaulted her or that he had caused her injuries, denying further that Nelson had either threatened her or had instructed her what to say when she testified. On re-examination by the State, Minifield denied that she was afraid of getting beaten up again. However, she admitted that on the date of a previous trial setting of the case against Nelson, she had been in the hospital, having received broken ribs from an assault occurring at a store on July 4, 2014. As with the assault on April 28, 2013, Minifield denied knowing who assaulted her on July 4. In addition, Minifield denied having initially told the staff at the hospital that the injuries she suffered on July 4 resulted from being kicked by a horse. She likewise denied telling the x-ray technician that Nelson had assaulted her on that second occasion. Minifield

4

admitted, however, that Nelson spent the night at the hospital with her on July 4 and asked her if she was going to come to court.

Jason Barnes, a paramedic with the Longview Fire Department, testified that he responded to an assault call April 28, 2013. Refreshing his recollection from notes he had taken on that night, he testified that he found Minifield lying on a bed with multiple abrasions and bruises over her body and several areas of dried blood. Her chief complaint was that she hurt all over, and when asked by Barnes to explain what had caused the injuries, Minifield told him that an assailant had beaten her with his fist and with a stick, similar to a walking stick. Based on his notes, Barnes testified that Minifield said that she was beaten by her "baby daddy."[3]

Lilly testified that she, Minifield, and Chad were riding around in Minifield's car on the day of the April 2013 incident. She said it was dark and at night when Minifield was assaulted. She recalled telling the police that someone with braids had started hitting Minifield and that she related to the police that Minifield had told her that Nelson was the assailant. She affirmed that she told the police what Minifield told her at that time.

Taylor was recalled to testify regarding the other two occasions on which he treated Minifield at the hospital.[4] He testified that he had seen her in the emergency room on the days of the 8th and 18th during the month of trial.[5] On the 8th, Minifield complained of an injury to her

---

[3]Although this term was never defined at trial, a fact-finder could reasonably infer that Minifield meant the father of her children.

[4]Although Nelson objected at trial to this testimony regarding extraneous events, no error in the admission of this testimony is asserted on appeal.

[5]This portion of the trial was held on July 25, 2014.

5

right chest, which she initially attributed to being kicked by a horse. However, Taylor testified that the injuries Minifield sustained were not consistent with a horse kick but, instead, appeared to have resulted from blunt-force trauma, consistent with multiple injuries as opposed to a single injury. The injuries she received were fractures to the sixth, seventh, and eighth ribs, a collapsed right lung, a contusion to the forehead, and a concussion. Taylor also testified that Nelson accompanied Minifield on that hospital visit and that it was Nelson who had provided the story of Minifield having been kicked by a horse. Eric Pope, a CT technologist at LRMC, testified that he escorted Minifield to the radiology department for CT scans on her July 8, 2014, visit to the hospital.[6] Once they arrived at the radiology department, she asked Pope to close the door. When Pope asked Minifield why, she said that the gentleman with her (Nelson) was the reason she was there.

Finally, Brooke King, the director of services at The Women's Center of East Texas, was called as an expert witness on domestic violence issues, and she testified regarding the patterns of behavior of victims of domestic violence. She testified that it is not unusual for a victim of domestic violence to stay in the relationship with the abuser, to minimize the incidents of abuse, and to try to help the abuser by being combative with law enforcement and by often recanting and then restating the story of their abuse. King also testified that it is not unusual for the victim to be uncooperative with the prosecution of the abuser, to refuse to testify, to testify falsely, or to present memory issues. She testified that the scenario of a person who initially identifies to law

_____

[6]Although Nelson objected at trial to this testimony regarding extraneous events, no error in the admission of this testimony is asserted on appeal.

6

enforcement officers and friends the identity of the perpetrator of an assault, then later reunites with the perpetrator and refuses to cooperate with the investigation and prosecution, is consistent with the behavior of a victim of domestic violence.

## II. There Was No Abuse of Discretion in Admitting Minifield's Recorded Statement

In his first point of error, Nelson complains that the trial court erred when it admitted Minifield's recorded statement into evidence. Nelson argues, as we understand it, that the recorded statement does not fall within an exception to the hearsay rule since it does not meet the requirements of a prior inconsistent statement;[7] of a statement of then-existing mental, emotional, or physical condition;[8] or of a statement made for medical diagnosis or treatment.[9] Therefore, Nelson maintains, it should not have been admitted as substantive evidence. He also argues that since Minifield had not testified at the time the recorded statement was admitted, it was inadmissible for impeachment purposes.[10] The State argues that Minifield's recorded statement

---

[7]*See* TEX. R. EVID. 801(e)(1)(A). The Texas Rules of Evidence were amended by orders of the Texas Supreme Court and Texas Court of Criminal Appeals, effective April 1, 2015. The Texas Rules of Evidence quoted in this opinion are the Rules in effect at the time of the trial of this case.

[8]*See* TEX. R. EVID. 803(3).

[9]*See* TEX. R. EVID. 803(4).

[10]In his harm analysis, Nelson also cites *Crawford v. Washington*, 541 U.S. 36 (2004), for the proposition that an out-of-court testimonial statement made to law enforcement officials is barred by the Confrontation Clause. However, he fails to explain to this Court how this legal principle is applicable to this case. Appellant is required to "cite specific legal authority and to provide legal argument based upon that authority." *Rhoades v. State*, 934 S.W.2d 113, 118 (Tex. Crim. App. 1996) (citing *Vuong v. State*, 830 S.W.2d 929, 940 (Tex. Crim. App. 1992)). Where adequate briefing is not provided, the contention may be overruled. *Id.*; *Heiselbetz v. State*, 906 S.W.2d 500, 512 (Tex. Crim. App. 1995). In this case, the declarant of the out-of-court statement, Minifield, testified at trial and was subject to cross-examination on the out-of-court statement. In *Crawford*, the United States Supreme Court specifically stated that "when the declarant appears for cross-examination at trial, the Confrontation Clause places no constraints at all on the use of his prior testimonial statements." *Crawford*, 541 U.S. at 59 n.9 (citing *California v. Green*, 399 U.S. 149, 162 (1970)). Therefore, *Crawford* does not bar the admission of Minifield's out-of-court statement. *See*

7

was admissible as an exception to the rule against hearsay as a statement of her present sense impression,[11] as a statement enabling the police to meet an ongoing emergency,[12] and as impeachment of her contradictory trial testimony.

We review a trial court's decision to admit evidence under an exception to the hearsay rule by employing the abuse-of-discretion standard. *See Zuliani v. State*, 97 S.W.3d 589, 595 (Tex. Crim. App. 2003); *Mumphrey*, 155 S.W.3d at 657; *Carter*, 150 S.W.3d at 241. In other words, we will not reverse the trial court unless a clear abuse of discretion is shown. *Zuliani*, 97 S.W.3d at 595; *Carter*, 150 S.W.3d at 241. A trial court abuses its discretion only when its decision "'was so clearly wrong as to lie outside that zone within which reasonable persons might disagree.'" *Zuliani*, 97 S.W.3d at 595 (quoting *Cantu v. State*, 842 S.W.2d 667, 682 (Tex. Crim. App. 1992)); *Carter*, 150 S.W.3d at 241. Further, if the trial court did not state upon what grounds it was admitting the recorded statement, as in this case, we will uphold the decision to admit the evidence "if it is correct on any theory of law applicable to the case." *Penry v. State*, 903 S.W.2d 715, 750 n.34 (Tex. Crim. App. 1995) (per curiam) (citing *Romero v. State*, 800 S.W.2d 539, 543 (Tex.

*Mumphrey v. State*, 155 S.W.3d 651, 657 n.1 (Tex. App.—Texarkana 2005, pet. ref'd); *Carter v. State*, 150 S.W.3d 230, 241 n.13 (Tex. App.—Texarkana 2004, no pet.).

[11]*See* TEX. R. EVID. 803(1).

[12]The Court of Criminal Appeals has recognized that "factors to consider when determining whether statements were made during on [sic] ongoing emergency" include:

> 1) whether the situation was still in progress; 2) whether the questions sought to determine what is presently happening as opposed to what has happened in the past; 3) whether the primary purpose of the interrogation was to render aid rather than to memorialize a possible crime; 4) whether the questioning was conducted in a separate room, away from the alleged attacker; and 5) whether the events were deliberately recounted in a step-by-step fashion.

*Vinson v. State*, 252 S.W.3d 336, 339 (Tex. Crim. App. 2008) (citing *Davis v. Washington*, 547 U.S. 813, 829–30 (2006)). Minifield's recorded statement does not comport with these factors.

Crim. App. 1990)). Since we find that the statement was properly admitted as an excited utterance under Rule 803(2),[13] we need only to address the admissibility of the evidence under that rule. *See Penry*, 903 S.W.2d at 750.

"Hearsay is a statement, other than one made by the declarant while testifying at a trial or hearing, offered in evidence to prove the truth of the matter asserted." *Zuliani*, 97 S.W.3d at 595 (citing TEX. R. EVID. 801(d)). Hearsay is not admissible unless it is permitted by statute or the Rules of Evidence. *See* TEX. R. EVID. 802. Rule 803(2) allows the admission of hearsay that is also an excited utterance. TEX. R. EVID. 803(2), 60 TEX. B.J. 1129, 1149 (1998, amended 2015); *Zuliani*, 97 S.W.3d at 595. At the time of trial, Rule 803(2) defined excited utterance as "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." TEX. R. EVID. 803(2), 60 TEX. B.J. 1129, 1149 (1998, amended 2015); *Zuliani*, 97 S.W.3d at 595; *Mumphrey*, 155 S.W.3d at 657–58; *Carter*, 150 S.W.3d at 241. While a court may consider the amount of time elapsed between the event and the statement and whether the statement was made while responding to a question, these factors are not dispositive in determining whether the statement is admissible as an excited utterance. *Zuliani*, 97 S.W.3d at 595–96; *Mumphrey*, 155 S.W.3d at 658; *see also Lawton v. State*, 913 S.W.2d 542, 553 (Tex. Crim. App. 1995), *overruled on other grounds by Mosley v. State*, 983 S.W.2d 249, 263 (Tex. Crim. App. 1998) (statement in response to police questioning at hospital one hour after exciting event); *Salazar v. State*, 38 S.W.3d 141, 154 (Tex. Crim. App. 2001) (no evidence of time lapse between assault and statement). Rather, "[t]he critical determination is 'whether the

---

[13] *See* TEX. R. EVID. 803(2).

9

declarant was still dominated by the emotions, excitement, fear, or pain of the event' or condition at the time of the statement." *Zuliani*, 97 S.W.3d at 596 (quoting *McFarland v. State*, 845 S.W.2d 824, 846 (Tex. Crim. App. 1992)); *Mumphrey*, 155 S.W.3d at 658; *Carter*, 150 S.W.3d at 242. Thus, even if a substantial amount of time has passed since the event and the statement is in response to questioning, the statement is still admissible if there is evidence that the declarant was still experiencing the emotion, excitement, fear, or pain of the startling event. *Salazar*, 38 S.W.3d at 154; *Carter*, 150 S.W.3d at 242.

At the time the trial court admitted the recording, the evidence before it showed that Yates and Teter had responded to an assault call, finding Minifield lying on a bed in the fetal position. At that time, she had fresh cuts on her legs, face, arms, and head, and she complained that she was in pain. She was immediately transported to LRMC, where her statement was taken and recorded. The medical records (which had previously been filed by affidavit) show that she presented to the hospital and was triaged at 23:36, or 11:36 p.m., complaining of a pain level of ten on a ten-point scale. Teter states on the recording that the statement began at 11:45 p.m. Further, as previously stated, the recording shows that Minifield has an apparently fresh and as yet untreated gash on the top of her head, multiple lacerations on her chin, face, elbow, and legs, and contusions on her elbow and legs. Although Minifield appears coherent on the recording, during the interview she periodically closed her eyes and gave only brusque responses to questions, which, considering the extent of her injuries, could reasonably be interpreted to mean that she was in significant pain at

10

the time she made the statement.[14]  Since it was admissible as an excited utterance, the trial court did not clearly abuse its discretion in admitting Minifield's recorded statement.

We overrule this point of error.

### III.    There Was Sufficient Evidence to Support the Conviction

In his second point of error, Nelson challenges the legal sufficiency of the evidence supporting his conviction.  Nelson argues that without Minifield's audio/video-recorded statement, there is insufficient evidence to identify him as the perpetrator of the assault.  The State argues that even without Minifield's recorded statement, there was sufficient evidence that Nelson was the perpetrator of the assault to support the conviction.  We agree that there is sufficient evidence to support the conviction.

In reviewing the legal sufficiency of the evidence, we review all the evidence in the light most favorable to the verdict to determine whether any rational jury could have found the essential elements of the offense beyond a reasonable doubt.  *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)); *Bell v. State*, 326 S.W.3d 716, 720 (Tex. App.—Dallas 2010, pet. dism'd, untimely filed) (citing *Brooks*, 323 S.W.3d at 898).  We examine legal sufficiency under the direction of the *Brooks* opinion, while giving deference to the responsibility of the trier of fact "to fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts."  *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (citing *Jackson*, 443 U.S. at 318–19).

---

[14]A fact-finder may reasonably infer that an assault victim suffers pain based on the circumstances of the injury.  *See Garcia v. State*, 367 S.W.3d 683, 688 (Tex. Crim. App. 2012); *Randolph v. State*, 152 S.W.3d 764, 774 (Tex. App.—Dallas 2004, no pet.).

Legal sufficiency of the evidence is measured by the elements of the offense as defined by a measure the courts call a "hypothetically correct jury charge." *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). The hypothetically correct jury charge "accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried." *Id.*

Based on the information and the statute, to convict Nelson, the State had to prove beyond a reasonable doubt that (1) Nelson (2) intentionally, knowingly, or recklessly (3) caused (4) bodily injury to (5) Minifield (6) by striking her with a piece of wood, or a stick, or an unknown object and that at the time, (7) Minifield was a member of Nelson's family. *See* TEX. PENAL CODE ANN. § 22.01(a)(1), (b)(2). On appeal, Nelson only challenges the sufficiency of the evidence identifying him as the perpetrator of the assault.[15]

In this case, there is sufficient evidence to support a finding that Nelson was the perpetrator of the assault, even in the absence of Minifield's recorded statement. Even though, at trial, Minifield denied that Nelson had assaulted her and claimed not to know who assaulted her that night, the trial court, as the exclusive judge of the credibility of the witnesses, was free to believe some, all, or none of her testimony. As the fact-finder, the trial court could also believe the statements she made shortly after the assault to her treating physician, her friends, and emergency medical personnel, rather than her trial testimony. In this case, Taylor testified that Minifield told

---

[15]Nelson states in his brief, "There is no suggestion in this case that [Minifield] was not injured. The only question is who inflicted her injuries." We note, however, that the evidence previously set forth is legally sufficient to prove the remaining elements of the offense beyond a reasonable doubt.

him on the night of the assault that her injuries were the result of Nelson hitting her with a stick. Minifield admitted talking with Lilly the day after the assault, and Lilly recalled telling the police that Minifield told her that it was Nelson who assaulted her. Barnes testified that Minifield told him that her assailant hit her with his fist and a stick and that her assailant was her "baby daddy." The trial court also heard testimony regarding a second assault on Minifield, her inconsistent explanations of the cause of her injuries, her initial identification of Nelson as the perpetrator of that attack, and her subsequently claimed lack of knowledge at trial regarding the identity of her assailant (this being consistent with her testimony concerning the attack which was the subject of the charged offense). None of this testimony is challenged on appeal and is sufficient evidence to support a finding that Nelson was the assailant. Therefore, we overrule this point of error.

We affirm the judgment of the trial court.


Bailey C. Moseley
Justice

Date Submitted: June 26, 2015
Date Decided: August 4, 2015

Do Not Publish